UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

N.J., by his next friend, KELLY JACOB,

        Plaintiff,

    v.                                   Case No. 20-C-227

DAVID SONNABEND, individually and in
his official capacity as Associate Principal of
Shattuck Middle School,

        Defendant.

A.L., by his next friend, TARA LLOYD,

        Plaintiff,

    v.                                   Case No. 20-C-276

BETH KAMINSKI, individually and in
her official capacity as Principal of
Kettle Moraine High School,

        Defendant.

## DECISION AND ORDER

These consolidated cases present the question of whether middle and high school administrators can constitutionally prohibit students from wearing shirts bearing images of guns while attending school. Plaintiffs are N.J., who at the time the case was filed was a seventh-grade student attending Shattuck Middle School in the Neenah School District, and A.L., who attended Kettle Moraine High School operated by the Kettle Moraine School District. N.J. and A.L., by their next friends, seek permanent injunctions enjoining the defendant school administrators from enforcing dress code prohibitions of clothing depicting firearms. The cases are before the Court

on the parties' cross-motions for summary judgment. For the reasons that follow, Defendants'

motion for summary judgment will be granted and Plaintiffs' motion will be denied.

## UNDISPUTED MATERIAL FACTS

### A. N.J. and Shattuck Middle School

N.J. is a student at Shattuck Middle School, which is operated by the Neenah Joint School

District and educates seventh- and eighth-grade students. David Sonnabend is the Associate

Principal at Shattuck Middle School and has been for all times relevant to this case. N.J. was a

seventh-grade student during the 2019–2020 school year and is currently in eighth grade. N.J. is

a supporter of the Second Amendment and a gun enthusiast. He goes target shooting on a regular

basis. He also hunts and has taken a hunter safety course. He believes that the personal possession

of arms, as guaranteed by the Second Amendment, is of value to society. He owns a variety of

shirts that express his beliefs.

Shattuck Middle School has a dress code. During the 2019–2020 school year, the dress

code provided that "[c]lothing must also be appropriate for a professional atmosphere and not

disruptive to the learning environment" and included a non-exhaustive list of what is not permitted.

Defs.' Proposed Findings of Fact (DPFOF) ¶ 12, Dkt. No. 36. The dress code was amended for

the 2020–2021 school year and now provides:

> The Neenah Joint School District prioritizes a safe learning environment. It is
> important that your student dress not compromise the safety of our learning
> environment for any of our students or staff. If a student's attire creates a learning
> environment that is deemed unsafe for students or staff, the student may be asked to
> change the clothing that is creating a disruption to the safe learning environment.

*Id.* ¶ 13. All teachers are made aware of the dress code at the start of each year, and all teachers

were informed during their in-service prior to the start of the 2019–2020 school year that clothing

with images of firearms was inappropriate and prohibited under the dress code. Students are made

aware of the dress code during the registration process, and the dress code is addressed on the first day of school in each core class as part of a Positive Behavioral Interventions and Supports lesson. Students are told that they can express individuality without compromising safety through slogans promoting tobacco, alcohol, drug use, or containing suggestive, sexual, or offensive references. They are also advised of safety concerns related to clothing with weapons images or references creating fear and anxiety in students. The prohibition against displaying images of firearms applies equally to all images regardless of whether the message conveyed is in favor of or against firearms and laws controlling their sale and use.

On February 12, 2020, N.J. wore a shirt with the inscription "Smith & Wesson Firearms – Made in the USA Since 1852." In addition to the inscription, which is apparently the logo of the Smith & Wesson company, the shirt also had a depiction of a revolver. A photograph of the shirt is shown below:



Dkt. No. 15 at 3.

N.J. visited his English Language Arts teacher, Jennifer Peterson, before class. She saw the Smith & Wesson shirt and observed that it had an image of a handgun on it. Peterson referred N.J. to Sonnabend, as N.J. had been warned several times that school year about wearing clothing that depicted firearms. Sonnabend spoke to N.J. that day and asked if N.J. had any clothing with

3

him that he could wear over the Smith & Wesson shirt. N.J. produced a sweatshirt from his backpack and used it to cover up the shirt and returned to class. Sonnabend again told N.J. that he could not wear clothing depicting firearms because it was disruptive.

Sonnabend called N.J.'s home, and N.J.'s mother's boyfriend, Jason Kraayvanger, answered the call. Sonnabend informed him that N.J. had worn the Smith & Wesson shirt to school and that he had asked N.J. to cover the shirt. Kraayvanger went to the school with another shirt. Kraayvanger did not bring a shirt for N.J. to change into but brought another example of what N.J. might wear. That sweatshirt had the words "I'm a patriot" and "Weapons are part of my religion." The sweatshirt, shown below, also included the text "$\frac{2}{A}$" and "$\frac{17}{76}$", referring to the Second Amendment and the year 1776, and depicts a medieval helmet alongside two antique rifles.



*Id.* Sonnabend interpreted Kraayvanger's actions as showing the types of clothing that N.J. liked to wear and might wear in the future.

N.J. was never disciplined for wearing a shirt depicting a firearm, but he was directed to remove or cover the image each time he wore one. It was only the images of the firearms that violated the dress code. N.J. would not have been prohibited from wearing, for example, a shirt

that only conveyed a message with words such as "Smith & Wesson," "1776," and "2A." DPFOF ¶ 33. Teachers and staff in N.J.'s academy have also previously asked N.J. to cover or change his shirt when he wore clothing depicting a firearm.

Students at Shattuck Middle School have reported to teachers and guidance counselors that clothing depicting firearms like those worn by N.J. made them feel uncomfortable and that they felt uncomfortable, anxious, and unsafe when N.J. wore shirts with images of guns in their presence in class. *Id.* ¶¶ 35–36. Sonnabend believed that N.J.'s repeated wearing of shirts depicting weapons caused a disruption to students in Shattuck's "At Risk Academy," where N.J. was enrolled, because the images of firearms made other students anxious and concerned and created an uncertainty for other students about whether guns would be brought to school. *Id.* ¶ 39. Students assigned to the At Risk Academy have been identified as at risk of not graduating from high school in accordance with the State of Wisconsin criteria. The At Risk Academy offers more individualized attention and utilizes a project-based learning method for students who may not have the same social and emotional skills as other students.

In February 2020, students seemed more sensitive about school violence as a result of two school shooting incidents that occurred at schools in nearby Oshkosh and Waukesha, and across the country in general. *Id.* ¶ 58. As a result of the school shootings, Shattuck Middle School tightened up its safety drills.

## B.     A.L. and Kettle Moraine High School

A.L. is a student at Kettle Moraine High School, a public school in the Kettle Moraine School District. Beth Kaminski is the Principal of Kettle Moraine High School. Like N.J., A.L. is also a gun enthusiast and supporter of the Second Amendment to the United States Constitution. On February 19, 2020, A.L. wore a shirt with an image of a gun to school. Kaminski had A.L.

report to her office to have a conversation with him. The shirt contained the words "Wisconsin Carry, Inc." and the organization's logo, which is a handgun tucked behind the inscription, as if the gun were in a holster and the inscription were a belt. An image of the shirt is shown here:



Dkt. No. 15 at 4. Kaminski and Associate Principal Bestor spoke to A.L. about the shirt, told him it violated the school dress code, and directed him to zip up his hoodie jacket, which A.L. did. The same image is also on the back of the shirt, along with the text of the amendment to the Wisconsin Constitution recognizing the right of the people "to keep and bear arms for security, defense, hunting, recreation, or any other lawful purpose." Wis. Const. art. I, § 25. Kaminski never saw the back of the shirt, however, because A.L. was wearing a hoodie jacket at the time.

Kettle Moraine High School has a dress code. The dress code provides in relevant part that students at Kettle Moraine should always strive to be neat in appearance, clean, well-groomed, and wearing attire that supports actively engaging in the lessons and project-based learning in the classroom. The dress code also provides that clothing styles that do not fit that description include, but are not limited to, articles of clothing with "inappropriate messages – including cartoons,

slogans, or advertisements which have more than one meaning, or those which depict or portray conduct or messages which may be illegal or offensive." DPFOF ¶ 74.

Kaminski interprets the dress code's prohibition on inappropriate messages to cover the image of a handgun. The prohibition against displaying images of firearms applies equally to all images regardless of whether they are pro-gun or anti-gun. On February 19, 2020, Kaminski and Bestor told A.L. he was not permitted to wear clothing that depicted firearms. Kaminski told A.L. that he had to cover up the shirt because the school did not allow any clothing that depicts images of drugs, alcohol, or firearms.

A.L. claims he wore a shirt on January 7, 2020, that had the words "AR 15" written on it parodying a square on the periodic table as part of an event called Second Amendment Tuesday, which was promoted by Wisconsin Carry, Inc. "AR 15" is the abbreviated name for a lightweight semi-automatic rifle that is commonly characterized as an assault rifle in the media. A.L. was not disciplined for wearing the AR 15 shirt.

Students at the high school reported feeling uncomfortable around other students who were wearing clothing that depicted or were associated with firearms. *Id.* ¶ 84. A shooting at nearby Waukesha South High School on December 2, 2019, caused an increased concern about school violence and school shootings. *Id.* ¶ 91. The day after the Waukesha shooting, on December 3, 2019, a Kettle Moraine High School student received an anonymous comment on a video he had posted on his YouTube channel that insinuated that an attack on the school was going to take place between first and second period the next day. *Id.* ¶ 93.

Finally, since the beginning of the 2020–2021 school year, A.L. has not been attending school in person. A.L. refused to comply with the school's requirement that all students wear

masks to prevent the spread of the COVID-19 virus. As a result, A.L. is participating in distance learning.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The fact that the parties filed cross-motions for summary judgment does not alter this standard. Where both parties file cross-motions for summary judgment, the court construes "all inferences in favor of the party against whom the motion under consideration is made." *Schlaf v. Safeguard Prop., LLC*, 899 F.3d 459, 465 (7th Cir. 2018) (citation omitted). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ANALYSIS

### A.     Mootness of A.L.'s Claim

As an initial matter, Defendants assert that, because A.L. is participating in distance learning and is not physically attending Kettle Moraine High School, his claims are moot and non-justiciable. "A claim becomes moot when the plaintiff's legally cognizable interest in the litigation ceases to exist or where the court 'can no longer affect the rights of the litigants in the case.'"

*Evers v. Astrue*, 536 F.3d 651, 662 (7th Cir. 2008) (quoting *Worldwide Street Preachers'* *Fellowship v. Peterson*, 388 F.3d 555, 558 (7th Cir. 2004)). Ordinarily, when a student has graduated from high school and an injunction would have no practical impact on the parties, the case is lacking a live controversy. *Stotts v. Cmty. Unit Sch. Dist. No. 1*, 230 F.3d 989, 991 (7th Cir. 2000). A.L. is currently enrolled in distance learning because of the COVID-19 pandemic. Although he is not physically attending classes in person, A.L.'s status as a student of Kettle Moraine is not the same as a former student or a graduate. A.L. may return to in-person classes at some point in the future, and thus, a court's ruling in this case can still affect his rights. A.L.'s claims are therefore not moot.

**B.**     **First Amendment Claim**

**1.**     *Protected Speech*

Defendants also argue as an initial matter that depictions of firearms do not constitute a form of expression protected by the First Amendment. Defs.' Br. in Supp. of Mot. for S.J., Dkt. No. 34 at 7–8. In support of this argument, Defendants cite cases involving claims that certain forms of conduct—such as flag-burning or sleeping in tents on the National Mall—are only protected by the First Amendment if the conduct is "inherently expressive." *See Texas v. Johnson*, 491 U.S. 397 (1989); *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288 (1984); *Tagami v. City of Chicago*, 875 F.3d 375, 378 (7th Cir. 2017) (citing *Rumsfeld v. Forum for Acad. & Inst'al Rights, Inc.*, 547 U.S. 47, 66 (2006)). Here, however, we are talking about a picture or image, not conduct. A picture or image of a gun is by its very nature expressive. *See Kaplan v. California*, 413 U.S. 115, 119–20 (1973) ("[P]ictures, films, paintings, drawings, and engravings . . . have First Amendment protection."). As Judge Adelman explained in rejecting a similar argument in *Schoenecker v. Koopman*,

9

the plaintiff's shirts are not analogous to the conduct at issue in those cases. True, wearing the shirts is conduct, but the shirts themselves are pure speech, in that they contain images and words that convey a message. The message may be ambiguous and open to interpretation, as the defendant has shown, but this does not deprive it of First Amendment protection. Rather, "a narrow, succinctly articulable message is not a condition of constitutional protection." *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 569 (1995). Otherwise, the First Amendment "would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll." *Id.*

349 F. Supp. 3d 745, 751 (E.D. Wis. 2018).

Like the defendant in *Schoenecker*, Defendants here also rely upon *Brandt v. Board of Education of City of Chicago*, in which the court held that a T-shirt worn by elementary school students was not protected expression. 480 F.3d 460, 465–66 (7th Cir. 2007). But in that case, the shirt at issue contained a "talentless infantile drawing" and some words indicating that the wearer was a member of the school's graduating class. The court held that the picture and few words on the T-shirt were "no more expressive of an idea or opinion that the First Amendment might be thought to protect than a young child's talentless infantile drawing which Brandt's design successfully mimics." *Id.* In this case, by contrast, the images of firearms and the accompanying text are intended to convey the wearers' positive attitude toward firearms and the right to possess them. The shirts are at least as expressive as the black arm bands at issue in *Tinker v. Des Moines Independent School District*, 393 U.S. 503 (1969). Wearing them is therefore entitled to constitutional protection outside the school context. The question of whether wearing them in the school setting is likewise entitled to constitutional protection requires consideration of the law governing student speech and Defendants' asserted justification for prohibiting them.

## 2. Applicable School Speech Standard

In *Tinker v. Des Moines Independent Community School District*, the Supreme Court held that public school students do not "shed their constitutional rights to freedom of speech or

expression at the schoolhouse gate." 393 U.S. at 506. There, the Court reversed a lower court ruling dismissing a suit against school officials who had prohibited a group of high school and junior high school students from wearing black armbands during school hours as a sign of protest of the Vietnam War. The Court held that, in order to justify prohibition of a particular expression of opinion, public school officials would have to show that "the forbidden conduct would materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." *Id.* at 509 (quotation marks and citation omitted). It is this test that Plaintiffs contend applies in this case. Plaintiffs argue that, because the undisputed evidence fails to demonstrate that the firearm images on their shirts caused a material and substantial disruption to their schools, the Defendants' prohibition of those images cannot stand.

In cases decided since *Tinker*, however, the Court has recognized that "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings," *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986), and that the rights of students "must be 'applied in light of the special characteristics of the school environment.'" *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (quoting *Tinker*, 393 U.S. 506). In *Fraser* the Court upheld the authority of school officials to sanction a high school student for giving a lewd and indecent speech nominating a fellow student for an elective student government office, and in *Kuhlmeier* the Court held that a high school newspaper was not a public forum and that the principal could constitutionally impose reasonable restrictions on articles that were offered for publication. In neither *Fraser* nor *Kuhlmeier* did the Court address the question of whether the prohibited speech was likely to cause a material and substantial disruption of the operation of the school, thus indicating that *Tinker*'s substantial disruption test is not absolute.

In *Morse v. Frederick*, 551 U.S. 393 (2007), its most recent decision on student free speech rights in the public school context, the Court rejected a high school student's claim that his First Amendment rights had been violated when the principal confiscated a banner bearing the phrase "BONG HiTS 4 JESUS" he displayed at an off-campus, school-approved activity and suspended him for ten days. Consistent with the principles underlying its school speech cases, the Court held that "schools may take steps to safeguard those entrusted to their care from speech that can reasonably be regarded as encouraging illegal drug use." *Id.* at 397. Again, the Court did not address whether the speech substantially disrupted the work of the school.

Plaintiffs view *Fraser*, *Kuhlmeier*, and *Morse* as narrow exceptions to *Tinker*'s more general rule that limitations on student free speech rights can only be justified by a showing of material and substantial disruption to school discipline and operation. *Fraser* held that a student's speech laden with sexual inuendo that was given at a school assembly was not protected because it was vulgar, and *Kuhlmeier* held that student newspapers are not a forum for student expression and thus student speech offered for publication can be more stringently regulated. *Morse* extended *Fraser*'s holding to speech encouraging illegal drug use. Since none of those exceptions apply to images of guns, Plaintiffs contend that *Tinker* supplies the test here.

The Seventh Circuit held in *Muller v. Jefferson Lighthouse School*, 98 F.3d 1530 (7th Cir. 1996), however, that *Tinker*'s substantial disruption test is not applicable to restrictions on student speech in non-public forums where the restriction is viewpoint neutral. Instead, the test under those circumstances is whether the restriction on student expression is reasonably related to legitimate pedagogical concerns. *Id.* at 1540; *see also Griggs v. Fort Wayne Sch. Bd.*, 359 F. Supp. 2d 731, 743 (N.D. Ind. 2005) ("Since Griggs's speech occurred in a nonpublic forum, *Muller* requires this Court to uphold the Board's ban on the speech as long as it is 'reasonably related to

12

legitimate pedagogical concerns.'"). *Muller* concerned whether a school could prohibit a student from distributing invitations to a religious gathering to students at the school while school was in session. Although the case involved an elementary school, the court assumed in its analysis that "grade schoolers partake in certain of the speech rights set out in the *Tinker* line of cases," since the question of whether *Tinker* applied to elementary school students had not yet been decided. *Id.* at 1539. The same analysis would therefore seem applicable to the schools N.J. and A.L. attend.

Under *Muller*, the first question to determine in deciding whether the less demanding reasonableness standard applies to restrictions on student expression is whether the school is a public forum. *Id.* "[S]chool facilities may be deemed to be public forums only if school authorities have by policy or by practice opened those facilities for indiscriminate use by the general public or by some segment of the public, such as student organizations." *Kuhlmeier*, 484 U.S. at 267 (quotations and citations omitted). When class is in session, neither Shattuck Middle School nor Kettle Moraine High School can reasonably be considered a public forum. They "do not possess all of the attributes of streets, parks, and other traditional public forums that time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Id.*; *see also Hedges v. Wauconda Comm. Sch. Dist. No. 118*, 9 F.3d 1295, 1302 (7th Cir. 1993) (noting that a "junior high school is a nonpublic forum, which may forbid or regulate many kinds of speech"). The first condition of *Muller* is therefore met.

The second condition that must be met for the less demanding reasonableness standard to apply is that the restriction must be viewpoint neutral. *Muller* noted that, "[e]ven where adults with full First Amendment speech rights are concerned, the government can reserve a nonpublic forum for the purpose for which it was created, and in so doing can censor speech on the basis of content." 98 F.3d at 1542. *Muller* emphasized, however, that "[w]hat the courts have not

13

permitted is suppression of a particular viewpoint." *Id.* (citing *May v. Evansville–Vanderburgh Sch. Corp.*, 787 F.2d 1105, 1113 (7th Cir. 1986)). In other words, schools cannot favor one viewpoint over another on issues that are fairly debatable. Thus, school districts may constitutionally adopt mandatory dress codes that require clothing with solid colors, thereby eliminating all printed or pictorial messages. *Jacobs v. Clark Cty. Sch. Dist.*, 526 F.3d 419 (9th Cir. 2008); *see also Blau v. Fort Thomas Public Sch. Dist.*, 401 F.3d 381, 391 (6th Cir. 2005) ("Consistent with these First–Amendment–benign objectives, the dress code does not regulate any particular viewpoint but merely regulates the types of clothes that students may wear."); *Canady v. Bossier Parish Sch. Bd.*, 240 F.3d 437, 443 (5th Cir. 2001) (holding that "School Board's uniform policy will pass constitutional scrutiny if it furthers an important or substantial government interest; if the interest is unrelated to the suppression of student expression; and if the incidental restrictions on First Amendment activities are no more than is necessary to facilitate that interest").

As the Ninth Circuit explained in *Jacobs*, *Tinker* is not to the contrary. In *Jacobs*, the court explained that, despite efforts to read *Tinker* more broadly, the actual holding of the case "extends only to viewpoint-based speech restrictions, and not necessarily to viewpoint-neutral speech restrictions." 526 F.3d at 430. The *Jacobs* court acknowledged that, although the terms "viewpoint-based" and "viewpoint-neutral" had not been used by the Supreme Court to describe speech restrictions when *Tinker* was decided in 1969, it is clear from the decision that "the Court found the armband prohibition unconstitutional not simply because it worked to prohibit students from engaging in a form of pure speech, but because it did so based on the particular opinion the students were espousing." *Id.* at 430–31. It was for this reason that the Court found it significant "that the school authorities did not purport to prohibit the wearing of all symbols of political or

14

controversial significance, . . . [but only] the wearing of armbands . . . worn to exhibit opposition to this Nation's involvement in Vietnam." *Tinker*, 393 U.S. at 510–11. Thus, "Tinker says nothing about how viewpoint- and content-neutral restrictions on student speech should be analyzed, thereby leaving room for a different level of scrutiny than that employed in either [*Fraser*], [*Kuhlmeier*], or *Tinker* when student speech is restricted on a viewpoint- and content-neutral basis." *Jacobs*, 526 F.3d at 431–32.

Nor to the contrary is the Seventh Circuit decision in *Nuxoll v. Indian Prairie School District # 204*, 523 F.3d 668 (7th Cir. 2008), which the court considered a second time under the name *Zamecnik v. Indian Prairie School District # 204*, 636 F.3d 874 (7th Cir. 2011). In that case, the court considered a high school's decision to prohibit a student from wearing a shirt that bore the legend "Be Happy, Not Gay," which the student wore to express a message of disapproval toward homosexual conduct. In deciding whether the First Amendment permitted the school to censor the message on the shirt, the court applied *Tinker*'s "substantial disruption" standard, albeit in a somewhat softened form. Rather than proof that substantial disruption would in fact ensue if the forbidden speech is permitted, the court held that it was enough if the school presented "facts which might reasonably lead school officials to forecast substantial disruption." *Nuxoll*, 523 F.3d at 673 (citations omitted).

But the restriction at issue in *Nuxoll* was not viewpoint neutral. The message the school wanted to censor in that case was in response to the annual "Day of Silence" promoted at the school by a group called the Gay, Lesbian, and Straight Education Network and sponsored by a student club called the Gay/Straight Alliance. Faculty and student supporters of the "Day of Silence" wore T-shirts with legends such as "Be Who You Are." *Id.* at 670. The plaintiff, on the other hand, was one of a group of students who apparently viewed homosexual behavior as intrinsically

15

disordered and physically and/or psychologically unhealthy.  For most of human history this view

was dominant, and many still hold it today.  *See Health Risks of the Homosexual Lifestyle*, FACTS

ABOUT YOUTH, http://factsaboutyouth.com/ posts/health-risks-of-the-homosexual-lifestyle/ (last

visited May 3, 2021); *see also* ROBERT R. REILLY, MAKING GAY OKAY: HOW RATIONALIZING

HOMOSEXUALITY IS CHANGING EVERYTHING (Ignatius 2014).  Some of the students with these

views participated in a "Day of Truth" that was held on the first school day after the "Day of

Silence."  School officials prohibited these students, including the plaintiff, from wearing shirts

with the phrase "Be Happy, Not Gay."  Applying the softened *Tinker* standard, the court concluded

in *Nuxoll* that the district court had erred in denying the plaintiff's motion for a preliminary

injunction.  On remand, the district court granted summary judgment and a permanent injunction

in favor of the plaintiff, which the court then affirmed in *Zamecnik*.

In *Schoenecker v. Koopman*, Judge Adelman read *Nuxoll* and *Zamecnik* as requiring

*Tinker*'s "substantial disruption" standard to a high school's ban on clothing that depicts firearms

in a decision granting the plaintiff student's motion for a preliminary injunction enjoining the

school from enforcing the ban. 349 F. Supp. 3d at 752.  As in this case, the principal had interpreted

the school's dress code as prohibiting clothing with images of firearms in response to student and

staff concerns about school violence, which increased when the plaintiff wore shirts with images

of firearms shortly after the shooting at Marjory Stoneman Douglas High School in Parkland,

Florida, that resulted in the death of 17 victims.  *Id.* at 752–53.  Applying the *Tinker* standard, as

refined by the Seventh Circuit in *Nuxoll*, Judge Adelman found that "the defendant has not shown

that the school has a reasonable belief that the plaintiff's wearing the shirts will create a threat of

substantial disruption, i.e., a threat of a decline in test scores, an upsurge in truancy, or other

symptoms of a sick school."  *Id.* at 753.  Having found the school's reasons for the ban insufficient

under *Tinker*, the court concluded that the plaintiff would likely succeed on the merits and granted the requested preliminary relief.

I find *Schoenecker* unpersuasive. More specifically, I am unpersuaded that *Nuxoll* mandates application of *Tinker*'s substantial disruption standard to the facts of this case. As explained above, *Nuxoll* concerned a restriction on student speech that was not viewpoint neutral. By prohibiting the plaintiff's shirt in that case, the school was putting its finger on the scale in the debate over the nature of homosexuality that it had allowed an outside group and the school's Gay/Straight Alliance club to introduce. In the context of that case, the plaintiff's shirt with the inscription "Be Happy, Not Gay" was a direct response to the message "Be Who You Are" that had been affixed to the shirts worn by other students and teachers the preceding day. Having allowed one side of the debate to wear clothing communicating their position, the school could not reasonably deny the other side the same right. The restriction imposed by Defendants in these cases, however, is viewpoint neutral. It is undisputed that the restrictions imposed by Associate Principal Sonnabend and Principal Kaminski only applied to images of firearms. Pls.' Resp. to Defs.' PFOF, ¶¶ 33, 81, Dkt. No. 41. It is also undisputed that "the prohibition against displaying images of firearms applies equally to all images regardless of whether they are pro-gun or anti-gun." *Id.* at ¶¶ 18, 83. Images of firearms, regardless of the message intended by the wearer, are simply not allowed.

Because the schools' ban on clothing bearing images of firearms is viewpoint neutral and because the schools are non-public forums, *Tinker*'s substantial disruption test does not apply. The question instead is whether the restriction on student expression is reasonably related to legitimate pedagogical concerns. *Muller*, 98 F.3d at 1530 (quoting *Kuhlmeier*, 484 U.S. at 273).

### 3. Pedagogical Concerns

In determining whether restrictions on the First Amendment rights of students resulting from a school's dress code are reasonably related to legitimate pedagogical concerns, it must be kept in mind that "[t]he Constitution is not a code of education, requiring schools to adopt whatever practices judges believe will promote learning." *Hedges*, 9 F.3d at 1301. "As the Supreme Court has stressed, such 'pedagogical concerns' include not only the structured transmission of a body of knowledge in an orderly environment, but also the inculcation of civility (including manners) and traditional moral, social, and political norms." *Muller*, 98 F.3d at 1540. In this way, schools prepare students for the world of work and active citizenship. "Because school officials are far more intimately involved with running schools than federal courts are, '[i]t is axiomatic that federal courts should not lightly interfere with the day-to-day operation of schools.'" *Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 440 (4th Cir. 2013) (quoting *Augustus v. Sch. Bd. of Escambia Cty., Florida*, 507 F.2d 152, 155 (5th Cir. 1975); *see also Nuxoll*, 523 F.3d at 671 (noting that "[a] judicial policy of hands off (within reason) school regulation of student speech has much to recommend it [because] . . . judges are incompetent to tell school authorities how to run schools in a way that will preserve an atmosphere conducive to learning . . ."). As long as school officials offer reasonable explanations for viewpoint neutral restrictions in student dress codes, courts should not second guess their decisions. In other words, school officials should be accorded significant deference in making such decisions. "This approach is consistent with the firm principle that student rights must be construed 'in light of the special characteristics of the school environment.'" *Muller*, 98 F.3d at 1540 (quoting *Tinker*, 393 U.S. at 506). It also recognizes that school administrators are answerable to a school board, whose members are, in turn, answerable to the voters, whose children attend the school and who have a strong interest in the education and

18

welfare of those children. With these principles in mind, I now turn to the justifications asserted by Defendants.

### a. Anxiety and Fear

Defendants argue that the prohibition of clothing bearing images of firearms is justified because of concern over the emotional trauma that images of firearms on clothing worn by their classmates may cause in some students. Defendants note that some students have expressed to them and some of their teachers that the images of guns cause them anxiety and fear. Defendants point to school shootings, including an incident that occurred in nearby Waukesha on December 2, 2019, in which a student who brought a gun to school and brandished it in a classroom was shot and injured by police. They also point to an incident that occurred the next day at an Oshkosh school where a student was shot and wounded by a school resource officer after the student stabbed the officer during an altercation. Defendants contend these incidents led to increased fear and anxiety among some students over school violence.

Plaintiffs challenge Defendants' contention that the images of guns made other students anxious and fearful that they might bring guns to school, and that they led to disruptions at school. Pls.' Resp. to Defs.' PFOF ¶¶ 39, 84. Plaintiffs argue that the deposition excerpts offered in support of these factual contentions constitute inadmissible hearsay and therefore should not be considered. *Id.* They also note that Kettle Moraine High School has a trap shooting team on its list of clubs, thereby undermining its argument that the mere image of a gun is disruptive of school discipline or the learning process.

With respect to Plaintiffs' evidentiary objection, statements of the declarant's then existing mental or emotional condition fall within an exception to the hearsay rule. Fed. R. Evid. 803(3). Both Associate Principal Sonnabend and Principal Kaminski were in a position to know of the

concerns expressed by other students over images of firearms on the apparel of classmates. But even if the students' concerns were not conveyed to them directly, it was not unreasonable for them to rely on reports from teachers and guidance counselors and conclude that some students, as well as teachers and staff, would have such concerns.

Although it is true, as Plaintiffs emphasize, that mere images of firearms cannot inflict injury on anyone, the image of a firearm on a classmate's shirt in the school environment can be a reminder of the school violence that lies at the heart of the schools' concerns. As one court has observed in addressing a similar provision in a Pennsylvania school's dress code:

> The problem of violence in schools has dramatically changed over the past 30 to 40 years. In the past, the largest problem regarding violence in schools was that children might get into a fight in the classroom or during recess. That minor, but not unimportant situation has evolved into major problems for public schools trying to adequately protect their students. Some students and others from outside the school community now bring guns into our schools and have committed some truly horrific acts with those weapons.

> Schools at all levels have been affected either directly or indirectly by the violent events that have occurred at places like Columbine, Virginia Tech, Northern Illinois, Nickel Mines and Red Lion. The impact of violence in schools is so great that it now has equal importance as the issue of illegal drug use in schools.

*Miller ex rel. Miller v. Penn Manor Sch. Dist.*, 588 F. Supp. 2d 606, 616–17 (E.D. Pa. 2008). The same court went on to note that "[e]lementary, middle and high schools which were once very open now have secure entrances and exits, security cameras, metal detectors, school resource officers and staff who are required to wear identification badges." *Id.* at 617. In the more-than-a-decade since the court's observations were made, the concern over school violence has not lessened. Today, we could add the shootings at the Sandy Hook Elementary School in Newtown, Connecticut, as well as the Marjorie Stoneman Douglas High School shooting referenced by the defendants in *Schoenecker* to the list of school shootings that have received extensive national attention and media coverage. As noted above, Defendants also referenced shootings at schools

in neighboring school districts during the time they sought to impose the challenged restrictions as adding to the climate of concern.

In light of these events, Defendants' decision to prohibit students from wearing clothes with images of firearms was not unreasonable. Students who wear clothing bearing the image of firearms continually display in the classrooms and hallways of the school throughout the day what some of their classmates and teachers may regard as a frightening reminder of the school violence that many believe has plagued the nation. Unlike those who enjoy hunting, trap shooting, or other forms of marksmanship, or who appreciate the history and importance of firearms as essential tools for personal, family, and national defense, many people today fear guns. That fear may not be entirely rational, but it is no less real. There are also students, though the evidence that either A.L. or N.J. are among them is far from convincing, that might seek to frighten or intimidate students by exposing them to such images. To the extent such fear and anxiety among students or staff arises, whether intentionally provoked or not, it undermines in those students who experience it the sense of safety and bodily security that are essential to promoting and maintaining an effective learning environment. Promoting and maintaining an effective learning environment are important pedagogical goals. *See Jacobs*, 526 F.3d at 435–36 (holding government's stated goals for uniform policies—increasing student achievement, promoting safety, and enhancing a positive school environment—"unquestionably qualify as 'important'"). Defendants were entitled to take these concerns into consideration in interpreting their school's respective dress codes.

To be sure, reasonable people may disagree that such a limitation is warranted. They may believe that the impact of such images on students and school staff is overstated and does not justify the limitation of the speech rights of middle and high school students. *See Nuxoll*, 523 F.3d at 677 (Rovner, J., concurring) (noting strong disagreement with majority about "the value of

21

speech and speech rights of high school students" and that "[y]outh are often in the vanguard of social change"). But a prohibition limited to images of firearms on clothing worn by students while attending class does not prevent students from debating the value of firearms or the merits of gun control laws. Students remain free to speak and write on the issue, as appropriate in classroom discussions and essays, or privately among themselves. Indeed, unlike students in schools that have adopted dress codes that prohibit all printed or pictorial messages on clothing worn by students, N.J. and A.L. even remain free to wear shirts that express their support for the Second Amendment in other ways. And of course, outside of school, they remain free to wear whatever they want, subject to parental supervision and laws governing obscenity and pornography. Whether the emotional trauma to other students and staff was overstated or not, given the relatively minor impact on student speech rights caused by the limitation, Defendants' decision to impose it was not unreasonable.

### b. Weapons Effect

In addition to their concern for the emotional well-being of students and staff for whom images of firearms in the classroom setting engender fears of school violence, Defendants also cite the so-called "weapons effect" as a further justification of the challenged restriction. The weapons effect is the name given to the theory that the mere presence of guns or images of guns increases aggression in people. As support for this justification of their policy, Defendants rely on the opinion of Professor Brad J. Bushman.

Professor Bushman is a psychologist who teaches communications at The Ohio State University. Professor Bushman has served on various committees studying gun violence and has conducted research and written on youth violence. Professor Bushman describes in his report several studies that suggest that the mere presence of guns has a tendency to make people more

aggressive.  Dkt. No. 33-4 at 55–60.  Based on his research and study, Professor Bushman opines that "[t]he existing research clearly indicates that images of guns can prime or activate aggressive thoughts in memory, which could interfere with school learning.  Images of guns can also increase aggressive behavior, which could occur on school grounds."  *Id.* at 58.  Professor Bushman concludes:

> In summary, research suggests images of guns at school (e.g., on shirts) should interfere with learning outcomes by priming aggressive thoughts. Images of guns can also lead to increased aggression at school and could lead to intergroup hostility by dividing students into "us" and "them" categories.

*Id.* at 59.

Plaintiffs deny that images of guns have been shown to increase aggression in students and challenge the admissibility of Professor Bushman's opinions.  They question his methodology and note that some studies are critical of the so-called "weapons effect."  They argue that upon consideration of the factors set forth in *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Professor Bushman's opinions are inadmissible.

Rule 702 of the Federal Rules of evidence "entrusts trial judges with a gatekeeping role designed 'to ensure that expert testimony is both relevant and reliable.'"  *United States v. Truitt*, 938 F.3d 885, 889 (7th Cir. 2019) (quoting *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011)).  In fulfilling that role, "the judge must determine whether the expert is qualified, whether his methodology is scientifically reliable, and whether the proposed testimony 'will help the trier of fact to understand the evidence or to determine a fact in issue.'"  *Id.* (quoting Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 592 (explaining that the latitude given to experts under the Rules of Evidence "is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline").  Applying these factors here, I conclude that Professor Bushman's opinions concerning the "weapons effect" are admissible.

23

There is no dispute that Professor Bushman has the qualifications needed to offer expert testimony in the relevant field. As his resume shows, Professor Bushman has a Ph.D. in psychology. He testified in his deposition to over thirty years of research and study on the impact of violent media on aggressive behavior and the link between narcissism and aggression. Dkt. Nos. 33-4 at 1 & 31 at 6:19–24. He lists 232 peer review articles, seven books, and 26 book chapters he has authored or co-authored on his resume, many involving the impact of violent media on aggressive behavior.

Professor Bushman testified that his opinions were consistent with over 50 years of research on the weapons effect. According to his report, Professor Bushman published a comprehensive review of weapons effect studies, which included 151 effects from 78 independent studies involving 7,668 participants. His meta-analysis found that seeing weapons increased aggressive thoughts, hostile appraisals, and aggressive behavior by a significant degree. His report and deposition also describe a comprehensive review of 43 studies involving 5,230 participants that used images of weapons depicted in a non-threatening and non-violent manner (i.e., just a photo of a weapon not pointed at anyone). Those studies, according to Professor Bushman, have found a significant weapons effect, as well. Dkt. Nos. 33-4 at 59 & 31 at 07:06–08:24. It was on the basis of those studies and his own research that Professor Bushman opined that images of guns on shirts worn by students would impact learning outcomes and increase aggression and intergroup hostility.

As Plaintiffs point out, the weapons effect has also been the subject of criticism by other researchers. Pls.' Br. in Opp., Dkt. No. 40, at 23–24. But a theory need not be universally accepted in order to be admissible in evidence. Professor Bushman's resume, deposition, and report provide sufficient evidence of his education, research, and experience as well as the methodologies used

in the studies he reviewed to meet the requirements for admissibility set forth in Rule 702. "Because there are areas of expertise, such as the social sciences in which the research, theories and opinions cannot have the exactness of hard science methodologies, trial judges are given broad discretion to determine whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case." *United States v. Simmons*, 470 F.3d 1115, 1123 (5th Cir. 2006) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153 (1999)) (internal citations and quotation marks omitted). In the exercise of that discretion here, I conclude that Professor Bushman's opinions are admissible.

The mere fact that Professor Bushman's opinions are admissible, of course, does not mean that they are true or that a neutral factfinder would find them credible at a trial. But given the deferential standard described above, that is not the question before the Court. The question is not whether this Court or a jury of laypeople would agree with Professor Bushman and adopt his view. The question is whether Defendants have a reasonable basis for concluding that the relatively minor restriction of students' ability to express their views about firearms in the school setting furthers important pedagogical goals. Reducing student aggression, of course, is such a goal. Given the body of study described by Professor Bushman, the limitation imposed by Defendants was reasonable.

## C.      Fourteenth Amendment Due Process Claim

Plaintiffs also allege that the school dress codes are unconstitutionally overbroad. They contend that, as a result of the lack of objective criteria in the dress code by which a student can determine what clothing is restricted, Defendants denied Plaintiffs their right to due process under the Fourteenth Amendment. Defendants counter that the operative dress codes provided Plaintiffs

25

with sufficient notice of the prohibited clothing items to satisfy the requirements of due process under the Fourteenth Amendment.

Plaintiffs did not respond to Defendants arguments regarding this claim. When a plaintiff fails to provide any argument in favor of his claim and offers no response to a defendant's argument in favor of summary judgment on that claim, he has waived the claim. *See Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1078 (7th Cir. 2016) ("[B]y failing to respond in any way to any of the arguments advanced by Defendants regarding counts 9, 14, 15, and 16, Plaintiffs have waived their claims."). Therefore, Plaintiffs waived their claim and Defendants are entitled to summary judgment on Plaintiffs' due process claim on this basis.

Plaintiffs' claim fails on the merits as well. "A law is unconstitutionally vague if it fails to sufficiently define the conduct it prohibits; the point of vagueness doctrine is to permit individuals to conform their conduct to the law's requirements and to guard against arbitrary or discriminatory enforcement." *Milestone v. City of Monroe, Wisconsin*, 665 F.3d 774, 785 (7th Cir. 2011) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972)). Students may challenge school policies based on their alleged vagueness, but the Supreme Court has held that the standards for determining vagueness apply differently in the school context:

> We have recognized that "maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures, and we have respected the value of preserving the informality of the student-teacher relationship." Given the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions.

*Fraser*, 478 U.S. at 686.

The student in *Fraser* was given a two-day suspension for delivering a sexually explicit speech at a school assembly. *Id.* at 678–79. The school's policy prohibited "[c]onduct which materially and substantially interferes with the educational process," which expressly included

26

"obscene" speech, and teachers had warned the student prior to his speech that it was "'inappropriate'" and that he might face "'severe consequences'" if he delivered it. *Id.* at 678. Despite these warnings, the student gave the speech. The Supreme Court easily disposed of the student's claim that the policy was unconstitutionally vague, finding his argument "wholly without merit." *Id.* at 686. The Court held that "the school disciplinary rule proscribing 'obscene' language and the pre-speech admonitions of teachers gave adequate warning to Fraser that his lewd speech could subject him to sanctions." *Id.* The Court also noted that the two-day suspension from school did not "rise to the level of a penal sanction calling for the full panoply of procedural due process protections applicable to a criminal prosecution." *Id.*

In this case, N.J. was told at the beginning of the year that under the schools' dress code, students could not wear shirts with images of firearms. Pls.' Resp. to DPFOF ¶ 17. A.L. was told when he wore such a shirt to school that it was not allowed. Neither student was ever disciplined or given any sanction. Given the absence of any sanction and the flexibility allowed in such matters, no due process violation can be shown.

## CONCLUSION

For the reasons set forth above, Plaintiffs' First Amendment and Due Process claims fail. Plaintiffs' motion for summary judgment (Dkt. No. 24) is therefore **DENIED**, and Defendants' motion for summary judgment (Dkt. No. 28) is **GRANTED**. The case is dismissed. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this 3rd day of May, 2021.

s/ William C. Griesbach
William C. Griesbach
United States District Judge